Case is IN RE PRINTLESS PREVIEWS, 2011-12-73. Mr. Eichmann, are you ready? Good morning, Nick. Please, go ahead. I have three issues I'd like to address today. The first is the examiner and the board's prima facie analysis in this case. The second is our affirmative showing of non-obviousness, which is based on the very references that are asserted in this case. And then the third thing I'd like to address is the objective condition. The core analysis set forth by the board is that all of the elements of Mr. Ripple's invention were disclosed in the prior art, except for the fourth element, conforming high-definition video to an edit decision list so that you can generate a preview. That's the board's theory. The board states then that it would be obvious to modify what was disclosed in the combination of the prior art by simply adding anti-definition video to that process. That theory is absolutely wrong. When you look at the combination of each of the different prior art methods that the board relies upon, you have two methods from the omit prior art, what we call the work current method, and the video output method. You then have secondary references in Lightworks and Parisi, and then a third category of tertiary references. None of those references, any combination you can think of, none of them discloses the same steps as the visual invention absent high-definition video. And the reason is this. There is no method, no combination, where there's a disclosure of transferring images from film to video and then going back and conforming those images to an intramedic decision list. What that means, Your Honor, is that you can actually eliminate every single reference in the claims of the Goodwill Patent, the high-definition video. Eliminate that. This claim would still stand on the combination of the prior art that is asserted in this case. And now, what did the board do wrong? A couple of things, and they actually conflict with each other, but I'm going to focus on the main thing. The board looked at the omitted prior art because that was the only prior art that even mentions previewing of any sort. And it focused on what we call the video output method. This is a method where there's a transfer of images to standard-definition video so that those images can then be edited. And then when the editing is completed, you simply output the images onto videotape and display that video in standard-definition format to the audience. The board interpreted that prior art method to include the step of both generating an interim edit decision list and then conforming the standard-definition images to that list. And that's absolutely wrong. That is actually a theory that we would address below with the examiner, both in connection with our arguments concerning the omitted prior art and with another reference that we overcame, which we referred to as the drag-draw reference that had something very similar. In the video output method, there is no generation of an interim edit decision list. There is no conformation of standard-definition video or any video to an edit decision list. So that's the starting premise that the board began with. Everything's there in the prior art. All you did is come along and add high-definition video. That premise is absolutely wrong, and right there is working reverse based on that finding law. The second point that I'm going to raise, and I'm not encouraging the court to go find other reasons that we can make a better argument than the board made, but to just make this absolutely clear about why this is, in fact, a non-obvious invention, let's put aside the noise analysis. Let's start with the omitted prior art, and then let's look at these additional references, Lightworks and Fruzzi, and take a look at what would those teach somebody who had the omitted prior art, the primary reference. Now, as I mentioned, the omitted prior art, there's two methods. The work print method, where standard definition video is created solely so that you can edit using it, and then when editing is done, you have to generate an edit decision list, go over to physical film, and perform an edit decision list, tie that film to the edit decision list, and display it. That's one method, and it was found to be very inconvenient and costly because that work print, that film work print, didn't need to be part of the editing process. It was only created solely for the purpose of being used. And by creating it, and then going back to it, and conforming it to an edit decision list, that added a lot of expense, cost, and time delays in the process. It also is something that they couldn't get around because everybody agreed at the time that film has the best images to display on the screens of the preview audience, and digital editing is the best way to go, so they were stuck with this. The second method that is disclosed in the background section of the patent addressed an attempt to fix that. People started thinking, well, we have these images that are in the non-linear editing system, they're in standard definition format, they're good enough for us to look at while we're editing, why can't we just simply output these and put it on the screen of the preview audience? This isn't the real preview, the real showing of the movie anyway, this should be good enough, and we'll avoid all these additional steps of having to generate an interim edit decision list, and then go to a separate source of images and conform those images to the edit decision list. Now, what was wrong with that is that you cannot project standard definition video to an audience and have that simulate an experience of actually going to an actual movie, and that's what that purpose is of the previews. You want people to experience it as they will in the film, so you can sit back, get their comments, and make creative changes that help improve the film in the next cycle and cycle. So you have, and this is what we refer to in our briefing, as the conventional wisdom, another way to put it that might be more accurate is the cumulative wisdom, or the cumulative knowledge, as the point that the invention is found. You have this need and desire to edit using digital non-linear editing systems, and that's not going anywhere. You have a need for high-quality,  and that's not going anywhere. And you have the source of the problem that you have to generate an intramedic decision list and then not only create this separate set of images that are only going to be used for previewing and conform them, so that's sort of the starting point. How do we get away, how do we avoid this process of an intramedic decision list and conforming images that only exist, that are only there, solely because we know we're going to come back to them and conform them for previews? If somebody came from that background, had those methods in mind, and was looking around for a better way to do things, what they'd be looking for is a way that avoids what the wordprint method does, avoiding wordprint altogether, and also avoiding the creation of a separate set of images that are only going to be used for this interim purpose of previewing, not for the editing, not for the original capture of the images, not for the final distribution. Avoid creating that separate set of source and use something that's existing, create some existing images as part of the process. And on top of that, if you're able to do that, use existing images, you don't have to create or conform to an intramedic decision list. Coming from that background, if somebody came across the Lightworks reference, what they would find is a system that performed digital non-linear editing, that's nothing new, a system that did online confirmation of video, that's nothing new either. And then the only thing that was new in Lightworks was the process by which the edit decisions, not an edit decision list, but the edit decisions were carried over from the first system to the second. And that's Lightworks teaching. Let's avoid the creation of an edit decision list, even for the final process of conforming the final version of the film, and having edit decisions transferred over one at a time. So what that system would tell the person who started with the admitted prior art is one of two things. One, they would say, this system, I can't even use this because I've already decided that I want to end on film. And that Lightworks system, the portion of it that is described as the heavy work system, that's video in there. When that Lightworks process is done, you end up with video. That's not useful to the person who's editing motion pictures and both begins and ends on film, as were addressed in the background section. And that would create our patent claims. Now, if we want to really go out on a limb and say, what could they actually get from this Lightworks reference, maybe they would say, you know what? This person has found a way in the video world to avoid the interim edit decision list and speed up that process. Maybe there's a way that we can design a system where we're editing in digital video and there's an automatic transmission of edit decisions over to some other system that instead of conforming video, is actually conforming cutting and slicing film, so we still end up with film. That's another way to think about it. But that's not what's suggested by the reference and that's not even an argument at the board meeting. Lightworks, we can put aside. That adds nothing to the person who's trying to address the issues of the work current method and the video output method. Now, if we go to the other secondary reference, this is not something that anyone would even think to look to if they were going to preview. Preview motion pictures that are created on film. Parisi describes, it's an article in the Hollywood Reporter, he describes a test project done on cancer with a motion picture where they wanted to see how do these new high definition video cameras look when you project the images on film. This wasn't about actually creating a new process of editing motion pictures. There's nothing disclosed in there about that. This is about looking at the cameras and saying, are these doing a good enough job? Maybe one day we won't need film cameras. We can have a process that, from start to finish, is video. Somebody of ordinary skill in the art who's reading the Good Hill Invention, starting out with the two methods in the background section, they are not going to look at that and say, this is a way for me to now preview and arrive to edit and preview and then arrive at the Good Hill method. At most what they're going to look at is this is interesting. I can avoid all these interim steps that are concerning me, that are creating previews, if I just eliminate film altogether. But they would walk away from that thinking, you know what? If these images are good, if they're described in here, he's saying that they look better than they expected, but they're not good enough. So maybe one day these cameras, as the article suggests, will be good enough so that they'll actually be interchangeable with film. Maybe we can then go to an all-film purpose, excuse me, an all-digital purpose and eliminate film altogether. It's an entirely different direction than Mr. Good Hill went, an entirely different direction than what the claims require. Now, the third point that I want to address is the objective indicia in this case. And the objective indicia is, in fact, undisputed. What's disputed is whether it's sufficient to overcome the prima facie case. Now, as I just explained, the Board's prima facie case does not stand on its own merits. For the reasons I've just asserted, we have the fireworks not leading there in another direction. And then if we actually look at what the undisputed facts show, Mr. Good Hill filed for his application in February 1996. He got his patent in November 1998. He went and started promoting it to others in January 1999. Just six months later, despite a non-disclosure agreement, a confidentiality agreement with the very company that he disclosed his invention to, that company starts offering the very same service to everybody and touting it as something that's revolutionizing the industry. Six months after that, or rather a year after that, that was July of 1999 when I came out with that, in a May 2006, 2000, excuse me, publication, American Cinematographer magazine reports on the very first use by the Post Group, that first infringer of Mr. Good Hill's method. And it talks about it as standing an old system on its head and describes all these various benefits that flow directly from Mr. Good Hill's invention. What follows then is a series of discussions in the Post Army. Some of it has been described as puffery marketing materials, but much of it is actually in independent publications. American Cinematographer referenced the article from the Editor's Guild in 2002. This is all attached to Mr. Good Hill's declaration. And then a chapter written by Leon Silverman in a book called Understanding Digital Cinema. Mr. Reichman, you wanted to save a few minutes. You have two minutes left. In each one of those references, it's undisputed that it wasn't until 1999 that the method was first used. And after that, everybody, including through 2000, 2002, and 2005, is describing it as a new method that revolutionized the industry. That is powerful, objective evidence of that. Thank you, Mr. Reichman. We'll save the rest of your time. Mr. Wood. Thank you, Your Honor, and may it please the Court. It is correct that the Board's theory is that the claimed method is the prior art method using standard definition upgraded to high definition using known high definition recording, storage, and display in telecine equipment. The key factual dispute, as Mr. Reichman identified, is whether in the prior art, again using standard definition, video, the digital nonlinear editing equipment actually generates an edit decision list and then the NTSC or standard definition video is conformed to that list. The Board made the finding that that is the case and that finding is supported by substantial evidence. Specifically, that part of the admitted prior art that the Board identified, which is essentially portions of column 4 of the 512 patent at A3657. Essentially, what the admitted prior art says is that one can still prepare a preview version of lesser quality by using the information stored in the digital nonlinear editing equipment to generate a preview on NTSC-compatible videotape or similar low-definition format. The information stored in the DNLE as portions of column 3 make clear, for example, at lines 47, 8, and 9, the equipment keeps in memory an electronic list of time codes that refer to the frames of the picture and sound in order in which they appear and then lower in that column, that's exactly how the edit decision list is defined. When the editor is satisfied that the film is complete, the editor uses the equipment to generate an edit decision list, a table of codes that describes, again, exactly which frames of the picture appear in the completed work and in what order. So that is the substantial evidence that supports the Board's finding in that regard. In addition to that, the other secondary references reinforces the point that in the prior art, the video is not simply, or the NTSC video is not simply spit out or output from the DNLE equipment. There's a process of generating an edit decision list and conformance. For example, in Lightworks, page A102, in many current systems, an edit decision list is produced. This is a list setting out which clips from which source are to be put together in what order to make the final product. And that's then a few lines down. In the case of videotapes, so this process applies not only to film, but videotapes, it is known to supply the edit decision list in the form of a computer software to equipment, which will assemble a final videotape from various source tapes. The point is, it just reinforces the point that there is that process of generation of EDL and conformance, not simply spitting out something from the digital nonlinear editing machine. And Parisi also reinforces that. Let me just, let's see, let me just address the teaching way argument with respect to Lightworks. Lightworks does not teach away from the invention. What it does is identify a certain context in which an EDL might not be appropriate. That's, for example, live TV or live sporting event when time is of the essence. It does not disparage the use of an EDL for other purposes. For example, the creation of a film where time is not that big a factor. And I would refer to page A104 in support of that notion. Mr. Wood, the board's opinion at page 12 says, we do not agree that a conclusion of obviousness requires that each limitation be expressly described in one of the references. When would it be appropriate to reach a conclusion of obviousness when there's a gap in the references? I think the best way to answer that is to go on to the board's analysis where the general question of obviousness is whether a person of ordinary skill in the art, whether the invention would be obvious to a person of ordinary skill in the art with the knowledge of the references. So, for example, the one in this case, the one limitation that is not literally present in one particular reference is using, is conforming visual images that have been transferred from the high-definition video storage medium to the headed decision list for preview screening on a big theater-like screen that simulates cinema resolution and picture quality. But what the prior art does teach is conforming the visual images that have been transferred to standard-definition video to an edited decision list as we, as I just discussed for preview screening. And it also discussed conforming high-definition video and that is the admitted prior art. And it also discloses conforming high-definition video for preview and that is for example, the Parisi reference on page 836. I'm not sure you're addressing Judge Lynn's question. Okay, I'm sorry. Which was, when there's a gap, how do you find obviousness? The limitation is suggested by the prior art. It's obvious from the prior art. So you're saying there's no gap? Right. I think that's the best way to put it. So you're saying even if there's no disclosure of a particular structure or a particular step, if there's a suggestion that would lend one of ordinary skill in the art to conclude that such structure or step exists or could exist, that's enough?  Your Honor. That is the Board's analysis and that's legally correct. I can remember way back when, when I was an examiner, some of the toughest problems we faced when we went up, we did comprehensive searches and we found references that covered every element of the claim except one little thing. And it was common practice back then, and I think you're justifying the practice that the examiners very frequently would say, well, the claim is rejected, A, in view of B and C. With respect to the last element, that's a matter of mere design choice of no patentable consequence. It was a nice phrase. It had a nice ring to it. But I often wondered whether that was legitimate or not. Well, the Board fortunately did not rely on that conclusory statement. I think its analysis goes, obviously, goes past that. In that analysis is, if the limitation is conforming HD video to an edit decision list for preview, and you have prior art that conforms standard definition video to an EDL for preview, and you have known HD equipment, and you have known reasons why HD was preferable, for example, better picture, better preview, then the person who organized the skill in HD would be led in that direction. It would be a fairly strong push in that direction. Do you want to address secondary considerations argument? Yes, Your Honor. Let me say that Mr. Reitman concentrated on the copying evidence, so I'll focus primarily on that. The point the Board was making is that there are other reasonable inferences that can be made from the copying evidence. Prior independent development, going out and seeing what was commercially available, and implementing what is commercially available in an obvious manner. That's point number one. Point number two is there's such a strong case, a case of obviousness, that even strong secondary consideration evidence would be insufficient to overcome that. If the panel has no more questions, I'll cede the rest of my time. Thank you, Mr. Wood. Thank you, Your Honor. Mr. Preheim has about a minute and a half of rebuttal time. I'm sorry, Mr. Eichmann, you saw Mr. Preheim earlier. Of course, Judge Lin, in that section of the board's opinion, that's addressing an argument that we didn't make. We never argued that all the references have to expressly or inherently excuse me, expressly disclosure. That's not our argument. That's why there is a gap and that's why they have to use the word suggest to try to get them to get Mr. Goodell's invention. As I explained in my opening argument, that analysis does not work. Why isn't it proper to consider what the references suggest to those of skill in the art in a 103 context? Your Honor, it's absolutely appropriate to consider. We're not saying that it isn't. We're starting from this point. It's undisputed that all the references combined do not expressly or inherently disclose all limitations. Now, let's look at those secondary evidences.    What are those secondary evidences? Now, with respect to this issue of the video output method, they cannot rely on the interpretation of that method in the patent. The examiner expressly agreed with our interpretation and this is set forth in pages 10-12 of our reply brief that that does not disclose the generation or confirmation to an intramedic decision list. And finally, the secondary evidence is not just of copying. It's of long-felt need beginning in early 90s and continuing even after Mr. Goodhill disclosed his invention. Thank you.